## IN THE
## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | |
|---|---|
| SILVIA M.,<br>        Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>        Defendant. | Case No. 4:17-cv-04246-SLD-JEH |

### Report and Recommendation

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 13) and the Defendant's Motion for Summary Affirmance (Doc. 19). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

### I

Silvia M. filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) on September 9, 2014 and alleged disability beginning on January 24, 2011. Her claims were denied initially on February 24, 2015 and upon reconsideration on June 4, 2015. Silvia filed a request for hearing concerning her applications for DIB and SSI. A hearing was held before the Honorable Deborah E. Ellis (ALJ) on October 18, 2016. At that hearing, Silvia was represented by an attorney and had the assistance of an interpreter, and a

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Docs. 8 and 18) on the docket.

vocational expert (VE), Silvia's son Rigoberto, and Silvia testified.  Following the hearing, Silvia's claims were denied on February 27, 2017.  Her request for review by the Appeals Council (AC) was denied on June 23, 2017, making the ALJ's Decision the final decision of the Commissioner.  Silvia filed the instant civil action seeking review of the ALJ's Decision on August 25, 2017.

## II

At the October 2016 hearing, Silvia was 45 years old, divorced, and lived with her two children.  She previously worked as a mushroom picker for between 12 to 13 years.  While doing that job, Silvia fell from a height of more than five feet in October 2009 and suffered injuries that she claimed rendered her disabled.  Specifically, she claimed the following conditions limited her ability to work: chronic low back pain with radiating leg pain; chronic neck pain; chronic fatigue; anxiety; and depression.  AR 268.

Silvia testified (via an interpreter) that her previous job as a mushroom picker was her only previous full-time job and she explained what, exactly, she did in that job.  Following that testimony, the VE identified Silvia's past work of mushroom picker, unskilled, and medium physical exertional level work as performed and per the Dictionary of Occupational Titles.  The ALJ asked the VE to assume a hypothetical individual with the same age, education, and past jobs as Silvia who could lift and carry 20 pounds occasionally and 10 pounds frequently, could sit for six hours during the day, could stand or walk for six hours out of the day, could push and pull six hours out of the day, could frequently climb ramps and stairs, could occasionally climb ladders, ropes, or scaffolds, could occasionally stoop, kneel, crouch, and crawl, was limited to perform simple, routine, and repetitive tasks, could interact occasionally with supervisors, co-workers, and the public, and her time off task could be accommodated by  normal breaks.  The VE testified the hypothetical individual could not perform her past

2

job but could perform the light jobs of hand packager, cafeteria attendant, and housekeeper.   The VE also testified that the individual could be off task approximately 15% of the work day, on average, but to exceed that would render full-time competitive employment unavailable.  The VE explained approximately one absence per month and 10 to 12 unscheduled absences per year would be allowed, and some employers have probationary periods of 30 to 60 days where they would not tolerate any absenteeism during that time.  When asked by Silvia's attorney whether the individual's limitation to Spanish-only affected things, the VE answered the Social Security Administration took into account whether a person could communicate in English based upon the Grid rules, not on whether or not they could perform their job duties.  Moreover, the application of those Grid rules was up to the ALJ.

Silvia then testified about herself.  She had a driver's license but was not able to drive since her accident at work in 2009 because it was difficult for her to bend or turn over to perform the maneuvers that drivers usually performed.  Instead, her son or ex-husband took her where she needed to go.  She attended school in Mexico until fourth or fifth grade.  She understood "a little bit" of English but did not speak English.  She thought about learning how to speak English but could not do it due to her concentration which was "not good" which was, in turn, caused by the pain she was in and the medications she took.  AR 61, 62.  She believed she could not do any kind of work because she was in "permanent pain and it [was] very difficult to concentrate due to the medications she [was] taking." AR 63.

Silvia said she "almost always" used a cane because it helped her to stand when her kids were not around.  AR 62.  She thought she would fall if she did not have her cane because her legs became very swollen and if she sat for a while her legs felt like pins and needles and numb.  Silvia said she took antidepressants and

3

anxiety medication, insomnia medication, and prescription medication for pain. She did not go to a pain management clinic. Dr. Benjamin Shepherd (whom she saw for counseling) prescribed her antidepressant medication, anti-anxiety medication, and medications for pain.

Silvia testified she spent most of the day in bed and when not in bed she sat in her recliner, watched TV, and slept. When questioned by the ALJ how she could sleep during the day if she could not sleep during the night due to pain, Silvia answered that she took short naps during the day. She microwaved meals but did not do the dishes, laundry, or house cleaning. She believed both her physical condition and emotional condition prevented her from driving. Silvia specified that her back prevented her from bending due to pain and her feet were "always" weak. AR 68.

Silvia's attorney then questioned her. Silvia testified she had constant pain in her lower back which radiated to her legs and feet. The pain affected her ability to walk, and she said she was able to walk 10 to 15 steps with a cane before she needed to sit down. She had been using the cane for "around two years." AR 69. Silvia also said she had constant pain in her neck which limited her range of motion. In a typical night, she said she slept between four and five hours a night and then had to stand up and go to her recliner where she "[felt] more comfortable." *Id.* She napped on and off while in the recliner. She believed her energy level would affect her ability to work. She unexpectedly fell asleep during the day six times a day and took six to eight naps a day.

Silvia stated the symptoms she experienced related to her anxiety and depression were that she was very tired and felt like doing nothing. Due to lack of sleep, she was "completely unable to concentrate." AR 71. She said she needed a chair inside the bathtub for bathing and it was "extremely difficult" to get dressed. *Id.* She could sit for about 15 minutes before she experienced increased

pain in her feet and legs.  Her anxiety manifested as "a lot of fears and panic" and feeling "desperate."  AR 72.  The side effects from her medications included fatigue and problems with concentration.  In response to the ALJ's follow up question, Silvia testified she went to see Dr. Shepherd generally twice a month, but sometimes three times a month and it was helpful to go more often because Dr. Shepherd "encourage[d] [her] a lot.  He help[ed] [her] a lot and he prescribe[d] a higher dose of medication."  AR 74.

Silvia's son Rigoberto was next questioned by her attorney.  Rigoberto said that since his mother's accident at work in 2009, her mood changed and she was "kind of like a couch potato/bed potato."  AR 76.  He said he did not see her as happy and she "kind of look depressed."  AR 80.  He said Silvia did not cook for him, and he cooked frozen foods and "easy stuff like that" for his younger brother. AR 76-77.  His younger brother was taken care of by Rigoberto and their father. Rigoberto helped his mother with house cleaning, laundry, dishes, yard work, and grocery shopping.  Rigoberto continued that his father mostly watched his younger brother, and Silvia could watch him "but there's nothing like that she could really do if he gets into trouble."  AR 78.  He observed his mom alternate between the recliner and her bed, and she stood at points throughout the day.  He estimated she spent eight hours a day in the recliner.  He could not give any examples of his mother's difficulties in concentration or memory beyond that she would ask Rigoberto to do something, check it off the list once he did it, and then ask him to do it again.  He believed that his mother's change in habit with bathing and dressing was more due to pain than depression.

Silvia finally testified about the fact that she was unknowingly pregnant with her youngest son at the time she had her work accident and it was "very difficult" to carry the baby with her back problem.

### III

The ALJ determined Silvia had the following severe impairments:  spine disorder; affective disorder; and anxiety disorder.  AR 23.  The ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is able to lift and or carry 20 pounds occasionally and 10 pounds frequently; she is able to sit for six hours and stand or walk for six hours in an eight hour workday; she can push/pull to the same extent that she can lift or carry; she can frequently climb ramps and stairs; she can occasionally climb ladders, ropes or scaffolds and occasionally stoop, kneel, crouch, and crawl; she is limited to simple, routine, and repetitive tasks; she is limited to occasional interaction with co-workers, supervisors, and public; the claimant could be off task up to 15% of the work day and have one absence per month or 10 absences per year; and only communicate in Spanish.

AR 25.  The ALJ addressed Silvia's alleged onset date of January 24, 2011 and commented that there was little medical evidence to support that date as on April 11, 2011, her primary care physician Alejandro Bernal, M.D. indicated that he did not think she was physically disabled.  The ALJ also noted Silvia had infrequent treatment with Dr. Bernal, the treatment record did not support ongoing complaints of back pain, anxiety, or depression, and after a visit in November 2011 Silvia had a two year gap in treatment with Dr. Bernal.  The ALJ determined the record supported a July 2011 independent medical evaluation with Dr. Salehi that diagnosed Silvia with low back pain syndrome with no neurologic explanation of her condition "with question to be raised about restricted behavior."  AR 27, *citing* AR 429.

The ALJ next addressed the limited treatment and diagnostic testing done by neurological surgeon Michel Malek, M.D. in October 2011.  The ALJ found the fact Silvia was not on any medications when she saw Dr. Malek as "inconsistent

with her extensive pain complaints and functional limitations[.]" AR 27. The ALJ recited the diagnostic findings at that time and explained the fact that the record did not support any ongoing treatment was inconsistent with such findings. Yet again, the ALJ noted Silvia's "significant gap" in treatment when she presented to Dr. Bernal over two years later such that the treatment record did not "support her complaints of pain and resulting significant functional limitations." *Id*. Even then, after the gap in treatment, Silvia presented to Dr. Bernal with complaints of dizziness, lightheadedness, and rash but did not complain of back pain, anxiety, or depression. The review of her musculoskeletal and psychiatric systems was negative. Her February 2014 physical examination findings were normal, her objective examination findings were normal, and she presented as comfortable. She was assessed with anxiety attack and panic attack and was prescribed Alprazolam and several days later she was placed on Paxil for depression. The ALJ pointed out that three years after her alleged onset date, Silvia's primary care treatment record did not support her allegations of significant chronic pain, and it did not support any persistent anxiety or depression once placed on medications prescribed by only Dr. Bernal, and she had no ongoing complaints or presentations. Thus, the ALJ determined the record inconsistent with Silvia's allegations that her symptoms of pain, anxiety, and depression started and had continued since her work injury.

In July 2014 she presented to neurosurgeon George DePhillips, M.D. to discuss surgical options for radiating low back pain. His notes indicated she underwent conservative treatment with limited response and at that time she used Ibuprofen and Tylenol as needed for pain. His notes also included the opinions of Dr. Selahi (surgery not a good option for Silvia), Dr. Malek (left the decision about surgery to Dr. DePhillips and Silvia), and Robert Eilers, M.D. Based upon the

available discogram[2], Dr. DePhillips was reluctant to proceed with surgery without an updated discogram. At that time, Silvia was in no acute distress, her motor strength was within normal limits, her straight leg raise test was negative bilaterally, and she had intact and normal gait. At her August 2014 appointment with Dr. DePhillips, the latter discussed surgery approaches with Silvia but then the next month he recommended against surgical intervention after reviewing her case, diagnostic testing, and her recent lumbar discogram.

At her September 2014 appointment with Dr. Bernal, Silvia presented for refills of her anxiety and depression medications and complained of neck pain which began within the past few months. She presented as comfortable and her mental status was grossly normal, but she had an anxious affect and depressed mood. Dr. Bernal refilled her medications and prescribed Norco. No abnormal findings or observations were made by Dr. Bernal in January 2015. In March 2015 Silvia complained of neck and back pain with anxiety among other things. Her examination results at that time were normal and she presented in no acute distress. Dr. Bernal refilled Silvia's Xanax and Norco prescriptions. The ALJ rejected her report that she was taking Norco for her pain since her work injury where it was not fully supported by the record. The ALJ also included Silvia's report in March 2015 that she stopped Norco in 2014 though it was helping her.

The ALJ next decided Silvia's presentation to Dr. Bernal throughout 2015 and 2016 failed to support the limited activities of staying in bed or lying in a recliner where Silvia presented in no acute distress and was even comfortable at times. The ALJ accordingly decided Silvia's and Rigoberto's testimony was inconsistent with the medical evidence. The ALJ then detailed Dr. Eilers' August 2015 independent evaluation of Silvia. At that time she did not allege limited

---

[2] A radiograph of an intervertebral disk. DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100031559 (last visited Aug. 13, 2019).

activities of only lying down or being in the recliner all day, she reported she may exceed her limits and then she had more pain. The ALJ commented her reported difficulty with grooming and other activities at that time was not supported in earlier treatment notes. The ALJ addressed the record of Silvia's increased complaints of anxiety in October 2015 and that Dr. Bernal advised her to see a psychologist. The ALJ explained, "[Silvia's] objective exam findings were consistent with her prior presentation with negative or normal physical findings" and were inconsistent with Dr. Eilers' examination two months earlier. AR 30. Silvia again complained of anxiety and depression in December 2015 though beyond a depressed affect she had normal or negative findings on examination. Her sertraline, which she reported had helped a little, was increased in January 2016. Two months after that, there were no significant complaints or findings related to anxiety or depression.

In April 2016, Silvia was referred to psychiatrist Benjamin Shepherd, M.D. She presented for a psychiatric evaluation with Dr. Shepherd in July 2016. He assessed her with major depressive disorder, recurrent severe without psychotic features and generalized anxiety disorder. Given that Silvia returned for treatment unaccompanied two weeks later, the ALJ noted Silvia was able to present independently even with treatment for accelerated mental health symptoms. She reported a "significant benefit just over the last couple of weeks" from which the ALJ concluded Silvia's medications were working. AR 31, *citing* AR 507. The ALJ detailed the records from Silvia's follow up appointments with Dr. Shepherd in August and September 2016 at which times her mental status examinations showed intact findings and were within normal limits except for affect and mood.

The ALJ found inconsistent with Silvia's allegations the fact her musculoskeletal and neurological examinations showed normal findings when

she presented to the hospital in June 2016 for vomiting and diarrhea. The ALJ continued:

> These findings are contrary to the claimant's alleged daily chronic pain that is totally debilitating that limits her activities and abilities. Reasonably, if a person is sick with other transient complaints, it seems as she would have more findings on her overall exam.

AR 31. The ALJ detailed the results of Silvia's physical consultative examination with Charles Carlton, M.D. on January 22, 2015 which included her ability to walk greater than 50 feet without use of an assistive device, she said she was in too much pain to attempt certain movements, she reported pain during manual muscle testing and strength testing in her hips and knees, and she offered +4/5 motor strength throughout her lower limbs and extremities. The ALJ also detailed the results of Silvia's psychological consultative examination with Mark Langgut, Ph.D. on January 30, 2015 which included that she presented as distressed and reported significant pain, and she reported she had always been somewhat "nervous" but that "feature" had increased since her injury. AR 405. The ALJ determined Silvia's presentation with Dr. Langgut was inconsistent with her presentations with Dr. Bernal in September 2014 and January 2015 when she presented as comfortable, alert, and oriented. The ALJ also determined the medical evidence did not support complaints or treatment for anxiety or depression until years after Silvia's work injury which was inconsistent with her statements to Dr. Langgut that her nervousness increased since her injury. The ALJ continued to recite the results of Dr. Langgut's testing and the diagnoses he provided of major depressive disorder, moderate, chronic, and untreated and generalized anxiety disorder.

The ALJ concluded Silvia's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical

and other evidence of record.  Specifically, with regard to Silvia's mental health treatment, the ALJ explained "the claimant mostly and until more recently received medications from her primary care physician only for depression and anxiety.  The claimant has had improvement with medications and limited treatment with gaps in treatment."  AR 33.  The ALJ detailed Silvia's reported "little daily activities."  *Id.*  Silvia received medication management:

> predominantly by her primary care physician Dr. Bernal with no other consistent treatment modalities used.  Her allegations are simply not supported to the extent alleged in the longitudinal record.  Her objective exam findings with normal strength are contrary to such limited activities.  In making the findings in this decision, the medical opinions and layperson statements of record were considered.

*Id*.  Silvia's ex-husband's reports of her constant pain and difficulty with sitting, standing, walking, sleeping, and concentrating were given little weight as inconsistent with the medical evidence and objective clinical exam findings.  Her son's testimony was "not given much weight" for substantially the same reasons.

Dr. DePhillips' September 2014 opinion that Silvia was totally disabled from meaningful or gainful employment due to her October 2009 work injury after taking into consideration her age, the effects of the injury, the condition of her lumbar spine as it then existed, and the symptoms provoked by those injuries was given "very little weight."  AR 34.  Dr. Eilers opined Silvia was not and never would be able to return to her competitive employment or her position picking mushrooms, and in light of her language limitations and her cognitive educational experience, she was probably permanently and totally disabled from any competitive employment as it would have to be sedentary work or desk based work and she did not have the skills to carry that out.  He further opined she was going to require lifetime management for pain and modification of pain

medications.  The ALJ gave Dr. Eilers' opinion "very little weight."  AR 35.  The
ALJ decided, instead, "the record does not support any greater limitations than
provided in the [RFC] that is consistent with the state agency medical consultant
findings and opinions."  *Id*.

Non-examining State Agency medical consultant Sandra Bilinsky, M.D.'s
February 2015 opinion provided that statements concerning Silvia's limitations in
lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair
climbing, and using hands appeared to be "grossly exaggerated in light of the
overall medical evidence[.]"  AR 91.  Non-examining medical consultant James
Hinchen, M.D.'s June 2015 opinion affirmed the prior opinion.  The ALJ gave those
opinions "great weight" and she elaborated:

> The later obtained medical evidence and medical opinions were
> considered in making the findings in this decision.  However, overall,
> the record does not support any significant change in [Silvia's]
> condition.  It appears that after the state agency medical consultant
> opinions were rendered that the claimant had more complaints
> related to anxiety and depression over pain with stressors at home
> (Exhibit 10F).  The claimant continued to present for medication refills
> only and conservative treatment from primary care physician only.
> The record does not support any physical therapy or other treatment
> modalities used in years.  The claimant reported improvement with
> medications and applying heat only.

AR 35-36, *citing* Exhibit 10F at AR 462-521.

The ALJ gave "little weight" to Dr. Shepherd's September 2016 opinion as it
was "inconsistent with the longitudinal record, mental status exams, and the
improvement with the limited treatment Dr. Shepherd ha[d] provided."  AR 36.
The ALJ acknowledged the record and Silvia's allegations supported pain being
the main issue with her ability to work.  As for her mental health issues as opined
to by Dr. Shepherd, the ALJ determined a normal examination of Silvia just three
months before Dr. Shepherd's September 2016 opinion was contrary to the

significant limitations to which he opined.  Further, the ALJ relied upon the earlier medical evidence and limited treatment by only Dr. Bernal and Dr. Shepherd's treatment record showing improvement with essentially normal findings on examination to reject Dr. Shepherd's opinion of marked and extreme limitations.

The ALJ gave "great weight" to the State Agency psychological consultants' opinions where:

> The overall record support[ed] mostly treatment of medications from [Dr. Bernal] until recently in July of 2016.  However, after starting treatment with psychiatrist, Dr. Shepherd, the claimant reported improvement with medications prescribed.  The claimant has not had any hospitalizations or ongoing presentations for exacerbated symptoms.  Even when she presented with increased symptoms, her mental status exams were mostly noted as intact or normal.  The later obtained medical evidence [] does not suggest any significant findings to significantly alter the state agency psychological consultant opinions.

AR 37.

Lastly, the ALJ articulated that the RFC assessment was supported by the State Agency medical and psychological consultants' opinions, conservative treatment, objective exam findings, diagnostic testing with consideration given to treating source and evaluator medical opinions, layperson statements, and Silvia's subjective complaints.  Thus, in consideration of Silvia's back pain and other pain allegations, she was reduced to light work with postural limitations.  Due to her medication side effect complaints, tiredness, anxiety, and depression she was reduced to simple, routine, and repetitive tasks.  Due to her overall symptoms and alleged reduced socialization, the ALJ limited her to occasional interaction with co-workers, supervisors, and the public.  Due to her allegations of reduced concentration, the ALJ pointed out Silvia could be off task up to 15% of the work day, and due to the combination of her symptoms, Silvia could be absent one time

per month or 10 absences per year "for alleged increased symptoms of pain or more recently mental health symptoms." *Id.*

## IV

Silvia argues:  1) the ALJ erred by failing to build a logical bridge between Silvia's cane usage, Dr. Eilers' opinion, Dr. DePhillips' opinion, and Dr. Shepherd's opinion to the conclusion Silvia is not disabled; 2) the ALJ committed harmful legal error in the RFC assessment; 3) the ALJ committed harmful legal error by failing to apply the Medical Vocational Guidelines (Grid) Rule 201.17; and 4) the AC committed harmful reversible error because it failed to include within the administrative record new and material evidence with a reasonable probability that the evidence would change the outcome of the decision.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence.  *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of

the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. §§ 404.1566 and 416.966[3]. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

---

[3] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Silvia claims error on the ALJ's part at Step Four.

**A**

Silvia first argues that the ALJ erred in assessing the specialists' opinions of record where he gave them only "little weight" and "very little weight." In particular, Silvia argues the ALJ erred in his weighing of Dr. Shepherd's, Dr. DePhillips', and Dr. Eilers' opinions. The Commissioner counters the ALJ reasonably assessed those three doctors' opinions.

20 C.F.R. § 404.1527(c) provides:

> How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include: 1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention. *Id.* Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do

16

so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2).[4]

With regard to Dr. Shepherd's opinion, the ALJ pointed out in his Decision that Silvia's presentation to Dr. Shepherd for a psychiatric evaluation was on July 1, 2016, five years after her alleged onset date, and was the first time she presented for specialized mental health treatment. The ALJ proceeded to discuss Dr. Shepherd's treatment records dated July 1, 2016, two weeks later in July 2016, August 19, 2016, and September 2, 2016. The ALJ also detailed Dr. Shepherd's September 2, 2016 mental capacity assessment. The ALJ highlighted that the opinion was provided "just two months after [Dr. Shepherd's] initial evaluation of [Silvia] on July 1, 2016, and the form was completed with Silvia present and appeared to be based upon her subjective complaints. The ALJ additionally highlighted that the form merely "listed a diagnoses of major depression disorder, recurrent, severe and generalized anxiety disorder, checked off boxes, and noted his findings were based upon past job history and current depression." AR 36.

The ALJ first concluded the opinion was vague, of no significant help, and was given no weight. *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion"). She explained the opined-to marked and extreme limitations were not supported by the longitudinal treatment record or Dr. Shepherd's own treatment record. The ALJ pointed out that Dr. Shepherd's treatment notes included Silvia presented as pleasant, cooperative, and in no acute distress at her second appointment, and her depressed mood was "seemingly less than her previous presentation just weeks

---

[4] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration. However, the rules in § 404.1527 apply to claims filed before March 27, 2017.

17

earlier," and mental status examination was normal, good, and intact in the various categories examined. AR 36. The ALJ further pointed out that Silvia "consistently presented as alert and oriented when presenting for treatment with other physicians[.]" *Id*. The ALJ concluded her consideration of Dr. Shepherd's opinion by stating, "This opinion is given little weight. It is inconsistent with the longitudinal record, mental status exams, and the improvement with the limited treatment Dr. Shepherd has provided." *Id*.

As the Commissioner points out, the ALJ clearly did not rely *only* upon the fact Dr. Shepherd appeared to complete his assessment based upon Silvia's subjective complaints. Instead, the ALJ determined Dr. Shepherd's opinion also was not consistent with or supported by the longitudinal record, and earlier in the Decision pointed out that Silvia's medications were working where she reported a significant benefit "just over the last couple of weeks." AR 31, *citing* AR 507. It is apparent that the ALJ considered Dr. Shepherd's opinion pursuant to the relevant regulations. The fact that Dr. Shepherd was the only treating mental health practitioner that gave an opinion as to Silvia's mental limitations does not mean that opinion was necessarily entitled to controlling weight. 20 C.F.R. §404.1527 instead provides that a treating doctor's opinion is entitled to such where well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record. Similarly, § 404.1527 does not preclude an ALJ from giving more weight to the non-examining State Agency physicians. *See* 20 C.F.R. § 404.1527(c)(1), (2) (providing more weight is generally given to a medical source who has examined or treated the claimant). The fact the non-examining State Agency physicians did not have Dr. Shepherd's treatment records or opinions before them does not render the ALJ's decision to give them more weight erroneous. The ALJ properly concluded Dr. Shepherd's opinion was not supported by the medical evidence as

a whole. Thus, the Court does not see how the State Agency physicians' consideration of Dr. Shepherd's notes and opinion would have changed the ALJ's conclusion.

With regard to Dr. DePhillips' opinion, the ALJ explained Dr. DePhillips' objective examination of Silvia in July 2014 provided findings that were "inconsistent with [Silvia's] significant functional limitations in standing, sitting, walking, and lifting.   Her normal strength is consistent with activity over inactivity."  AR 28.  Later in the Decision, the ALJ concluded that Dr. DePhillips' "treating specialist broad opinion is given very little weight."  AR 34.  The ALJ took issue with the fact Dr. DePhillips had not seen or treated Silvia in years, yet he opined she was disabled from her work injury years earlier.  The ALJ also faulted Dr. DePhillips' opinion because it "seem[ed] like [his] broad and conclusory statement without seeing [Silvia] or treating her in years is not supported."  AR 34.  The ALJ proceeded to point out the opinion was contrary to Silvia's presentations to Dr. Bernal which failed to support significant back pain and objective examination findings which failed to support an inability to work, was contrary to Dr. Bernal's 2011 opinion that Silvia was not physically disabled, and otherwise did not appear to be supported by the record.  Lastly, the ALJ explained Dr. DePhillips' opinion as to Silvia's inability to work was an opinion reserved for the Commissioner.

From the ALJ's explanation for why she gave Dr. DePhillips' opinion "very little weight," it is clear the ALJ considered the supportability and consistency of Dr. DePhillips' opinion, the length of treatment relationship (the gap in treatment), acknowledged Dr. DePhillips as a "treating specialist," and correctly pointed out he gave an opinion that was ultimately within only the Commissioner's purview. *See* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . .

the final responsibility for deciding these issues is reserved to the Commissioner"); 20 C.F.R. §§ 404.1546(c) and 416.946(c).  While Silvia argues there is "extensive support from other physicians in the record that agree with Dr. DePhillips' opinion," she cites to just two – Dr. Eilers' opinion and Dr. Malek's agreement that surgery should be decided by Dr. DePhillips and Silvia.  Plf's MSJ (Doc. 14 at pg. 16).  However, as discussed *infra*, the ALJ also properly considered Dr. Eilers' opinion to ultimately conclude it was entitled to "very little weight," and Dr. Malek's "agreement" about who should decide whether Silvia should proceed with surgery is not his expression of agreement with Dr. DePhillips' opinion that Silvia was unable to work.  Notably, in her discussion of Dr. Malek's October 2011 treatment record, the ALJ reasoned that inconsistent with Dr. Malek's diagnostic findings was that the record did not support ongoing treatment, and Silvia had a significant gap in treatment when she presented for treatment with Dr. Bernal over two years later.

Lastly, with regard to Dr. Eilers' August 2015 opinion, the ALJ gave "very little weight" to it because Dr. Eilers made a decision reserved to the Commissioner, it was inconsistent with other medical evidence of record (specifically her presentations to Dr. Bernal), and it was unsupported by the longitudinal medical record, gaps in treatment, and conservative and limited treatment.  The ALJ further explained, "Even [Silvia's] more recent treatment in 2015 and presentations are inconsistent with such broad conclusions that she cannot work."  AR 35.  Silvia argues the ALJ disregarded other critical evidence pertaining to Dr. Eilers' observation as to Silvia's cane usage.  Earlier in her Decision, the ALJ recited Dr. Eilers' August 2015 evaluation and that Silvia presented for that evaluation using a single point cane for weight shifting purposes.  The ALJ said, "this cane use was not supported on any ongoing basis with Dr. Bernal.  It appears to have been documented for a brief period in July and

20

August of 2015." AR 29. The ALJ also recited Dr. Eilers' impressions including that Silvia's spinal issues were secondary to her October 2009 fall at work, but not until *after* the ALJ noted Dr. Eilers did so "[a]fter the one time examination years after the original work injury[.]" AR 29.

The inescapable conclusion is that the ALJ built a logical bridge between the evidence and her conclusions as to the weight given to the treating doctors' and Dr. Eilers' opinions of record. Here the ALJ articulated her assessment of the evidence throughout the Decision and expressly considered the factors under 20 C.F.R. § 404.1527 in those portions of the Decision where she assigned weight to the treating doctors' and Dr. Eilers' opinions. The fact that there may have been consistency between Drs. DePhillips' and Eilers' opinions which the ALJ found *in*consistent with other relevant evidence does not render the ALJ's Decision in that regard erroneous. In the end, the ALJ considered the listed factors, articulated her reasons in support of the weight assigned to each doctor's opinion, and those reasons were, in turn, supported by the ALJ's citation to substantial evidence of record. As required of her, the ALJ enabled the Court to trace the path of her reasoning such that it was able to assess the validity of her ultimate findings. *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004); *see also Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). Silvia is not entitled to remand based upon the ALJ's alleged failure to build a logical bridge between Dr. Eilers', Dr. DePhillips', and Dr. Shepherd's opinions and the conclusion Silvia is not disabled.

**B**

Silvia next argues the ALJ committed harmful legal error in her RFC assessment, particularly her consideration of Silvia's mental RFC and her

consideration of Silvia's cane usage.  A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling."  *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009), *citing* SSR 96-8p.  Also, "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, at *7.

Silvia first argues that the ALJ's mental RFC assessment fell short for failure to consider her depression, anxiety, and medication side effects, and the ALJ failed to adequately consider her moderate limitations in concentration, persistence, or pace (CPP).  The Commissioner argues the ALJ reasonably assessed the record evidence regarding Silvia's mental impairments, reasonably relied on the fact that the record failed to document significant concentration and memory problems to discount Dr. Shepherd's opinion, and she relied upon the State Agency doctors who provided the only functional analysis of Silvia's mental limitations.  The Commissioner also argues the ALJ captured the State Agency doctors' opined-to limitations and exceeded them.

The Seventh Circuit Court of Appeals very recently explained:

As a matter of form, the ALJ need not put the questions [incorporating all of the claimant's limitations supported by the medical record including moderate limitations in concentration, persistence, or pace] to the VE in specific terms – there is no magic words requirement.  As a matter of substance, however, the ALJ must ensure that the VE is "apprised fully of the claimant's limitations" so that the VE can exclude those jobs that the claimant would be unable to perform.

*Crump v. Saul*, -- F.3d --, No. 17-3491, 2019 WL 3451276, at *3 (7th Cir. July 31, 2019). Silvia's argument here is essentially one of form where she argues that her limitation to "simple, routine, and repetitive tasks" was insufficient to account for her moderate limitation in concentration, persistence, or pace. As *Crump* provides, the Court must be satisfied that the ALJ ensured the VE was apprised fully of Silvia's mental limitations. As discussed above, the ALJ properly considered and gave only little weight to treating psychiatrist Dr. Shepherd's opinion. Also, the ALJ recited State Agency reviewing psychological consultant Dr. Mehr's opinion that Silvia had "the cognitive capacity to understand and remember instructions for simple work of a routine and repetitive type," and she retained "sufficient attention and concentration to persist at and complete work activities for the usual periods of time required in the general work force, to the extent her physical condition allows." AR 37, *citing* AR 107. The ALJ gave "great weight" to Dr. Mehr's opinion and State Agency reviewing psychological consultant Dr. Kravitz's opinion which "essentially affirmed the prior psychological consultant opinion of Dr. Mehr." AR 37. The ALJ pointed out that Silvia reported improvement with prescribed medications, she did not have any hospitalizations or ongoing presentations for exacerbated symptoms, and even when she presented with increased symptoms, her mental status exams were mostly noted as intact or normal.

The ALJ clearly considered Silvia's temperamental deficiencies in CPP and determined the opinion which provided she was still capable of persisting and completing work activities for the time required in the general work force was more fully supported by the record as a whole. The fact that the ALJ used nearly the same language as that of the opinion she found most supported by the record evidence shows the Court that the ALJ ensured the VE was apprised fully of Silvia's supported mental limitations and enabled the VE to exclude those jobs that

Silvia would be unable to perform.  Moreover, the ALJ emphasized that Silvia could be off task 15% of the work day due to her alleged reduced concentration "even though her attention and concentration were consistently noted as intact or normal."  AR 37.  To the extent Silvia argues the mental RFC was insufficient due to the ALJ's failure to address her reported limitations, Silvia has not argued the ALJ's assessment of her subjective statements and testimony was unsupported and so the Court will proceed no further on the former argument.

Silvia next argues that the ALJ's RFC assessment was erroneous where the ALJ dismissed her cane usage and instead assessed Silvia with work that required six hours of standing/walking during an eight-hour work day.  She claims the ALJ erred by playing doctor in concluding the medical evidence did not support her need for a cane.  In support of her argument, Silvia points to a statement she made at the hearing regarding the use of her cane.  As with her mental RFC challenge, Silvia has not challenged the ALJ's assessment of her subjective statements and testimony, and so, like the Commissioner contends, Silvia has waived any such argument.  *See Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 379 (N.D. Ill. 2012) ("Arguments and evidence that could have been raised in the opening brief but are first raised in a reply brief are waived").  In any event, the ALJ included a narrative discussion describing why the evidence did not support Silvia's need for a cane.

To begin with, as the Commissioner points out, no doctor opined that Silvia required a cane and she does not point to anywhere in the record where a doctor prescribed her one.  In addition, he ALJ noted that Silvia presented to Dr. Bernal on July 7, 2015 with a cane and complained of back pain with onset upon bending. The ALJ further included that on that date Silvia's stability findings were normal, and she had tenderness of the spine, a positive straight leg raise test, and decreased range of motion.  The ALJ stated, "The treatment record does not support any

ongoing support of cane use."  AR 29.  As for Silvia's use of a single point cane "for weight shifting purposes" observed during her evaluation with Dr. Eilers, the ALJ stated such cane use was not supported on any ongoing basis with Dr. Bernal, and it appeared to be documented for a brief period in July and August 2015. There is no indication the ALJ simply dismissed a line of contrary evidence regarding Silvia's cane use; the ALJ confronted evidence in the record of her cane use, her complaints of low back pain when performing tests such as the straight leg raise test, observations pertaining to Silvia's slow gait and ability to go from sitting to standing with the support of a chair, and her testimony that she was able to walk 10 to 15 steps with a cane, that she had used it for the past two years, and that she had a chair in the bathtub.  In her discussion of that testimony, the ALJ stated, "The claimant's allegations of significant functional limitations and cane use is not supported by the medical evidence."  AR 33.  As it was for the ALJ to assess Silvia's RFC, the ALJ appropriately considered the evidence, both medical and non-medical, pertaining to Silvia's cane use.  That does not amount to playing doctor, particularly where no doctor opined as to Silvia's need (or lack thereof) to use a cane and the ALJ nevertheless remained tasked with addressing the fact of her cane use.

## C

Silvia makes two final arguments:  1) the ALJ committed harmful error by failing to correctly assess the Grid rules given a sedentary RFC; and 2) the AC erred because it failed to exhibit documents dated January 25, 2017 as new and material evidence which demonstrates good cause for remand.  Silvia's Grid rules argument is moot because the Court has determined, *supra*, that the ALJ did not err with regard to her rejection of Dr. Eilers' opinion (limiting Silvia to sedentary work) and did not otherwise err in her RFC assessment which limited Silvia to light work.  Rule 201.17 provides for a "disabled" decision where the individual is

45-49 years old, unable to communicate in English, and who is limited to unskilled *sedentary* work. *See* 20 C.F.R., Pt. 404, Subpt. P., App'x 2, Table 1, Rule 201.17.

Finally, remand is not justified for the AC's failure to exhibit the January 2017 documents. The Commissioner filed a supplement to the transcript in this case to include those documents, and thus the Court does not assign error in that regard. The Commissioner argues any error the AC committed was harmless where the ALJ reasonably discounted an opinion Dr. Eilers provided that was less-limiting than his opinion in the new exhibit. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result). "Under 20 C.F.R. § 404.970(b), additional evidence submitted to the Appeals Council will be evaluated only if it is 'new and material' and 'relates to the period on or before the date of the [ALJ] hearing decision.'" *Stepp v. Colvin*, 795 F.3d 711, 721 (7th Cir. 2015). If the AC determines evidence is non-qualifying under the regulation, a court retains jurisdiction to review that conclusion for legal error. *Id*. at 722.

The new evidence was an Illinois Workers' Compensation Commission Arbitration Decision within which appeared Dr. Eilers' October 21, 2015 deposition testimony and August 10, 2015 Report (the latter of which the ALJ discussed in her opinion). Dr. Eilers testified that Silvia was not capable of physically performing a job for more than an hour or two a day, "and some days not at all." Plf's MSJ (Doc. 14 at pg. 31); AR 528. The Court is persuaded by the four-fold argument the Commissioner makes: 1) Silvia did not present a new medical opinion by Dr. Eilers, she introduced a worker's compensation decision relying on a medical opinion that she still has not provided to the agency or to the Court; 2) any error the AC made with regard to its consideration of the January 2017 Arbitration Decision was harmless where the ALJ in her Decision rejected Dr.

Eilers' *less* limiting opinion as contained within his August 2015 Report; 3) this "new" evidence (Dr. Eilers' deposition testimony) was dated October 2015 whereas the ALJ issued her Decision in February 2017 such that the Court will not incentivize claimants to sit on evidence until a belated time in an effort to obtain remand; and 4) the proper avenue for a remand on the basis of such evidence is a Sentence Six remand, but because Silvia has not made such an argument, the Court will not make it on her behalf and she has therefore not established good cause for her failure to present the evidence to the Commissioner sooner. *See* 42 U.S.C. § 405(g), sentence six (providing a court may remand a case to the Commissioner "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding").

## V

For the reasons set forth above, it is recommended that:  1) the Plaintiff's Motion for Summary Judgment (Doc. 13) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 19) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, denying benefits to the Plaintiff, Silvia M., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation.  FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.

*Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on August 15, 2019.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE